NOT RECOMMENDED FOR PUBLICATION
File Name: 12a0852n.06

**No. 10-1584 and No. 11-1992**

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED

*Aug 07, 2012*

LEONARD GREEN, Clerk

JEANNIE PARSONS, successor Personal )
Representative of the Estate of Randy Parsons, )
deceased, )
)
        Plaintiff-Appellant, )  ON APPEAL FROM THE UNITED
)  STATES DISTRICT COURT FOR
        v. )  THE EASTERN DISTRICT OF
)  MICHIGAN
)
PATRICIA L. CARUSO, Warden, Director, )
MDOC; JOHN F. MCCARTHY, MD;
LAWRENCE ALEXANDER, RN; JESSICA
PAUSITS, RN; HOPE HEEBSH;
CORRECTIONAL MEDICAL SERVICES, INC.,

        Defendants-Appellees.

---

Before:  SILER and KETHLEDGE, Circuit Judges; GRAHAM, District Judge.[*]

**SILER**, Circuit Judge.  This appeal involves two related cases brought under 42 U.S.C. §

1983 by the personal representative of Randy Parsons, a Michigan prisoner who died while in

custody at Standish Maximum Correctional Facility ("Standish").  Plaintiff argues that Parsons died

from a seizure after various officials failed to provide him with the anti-seizure medication Dilantin

over a number of days and that this failure amounted to deliberate indifference to Parsons's medical

needs in violation of the Eighth Amendment.  The district court granted summary judgment for all

defendants in both cases, determining that the defendants' conduct did not rise to the level of

---

[*]    The Honorable James L. Graham, United States District Judge for the Southern District of
Ohio, sitting by designation.

deliberate indifference. For the reasons explained below, we **AFFIRM** with regard to defendants Alexander, McCarthy, Caruso, and Correctional Medical Services, Inc. ("CMS"). However, when the evidence regarding Heebsh and Pausits is viewed in the light most favorable to Plaintiff, Plaintiff has plausibly demonstrated deliberate indifference to Parsons's serious medical needs. Therefore, we **REVERSE** the district court's granting of summary judgment as to those two defendants and **REMAND** for further proceedings.

## I.

Parsons was convicted in 1990 of second-degree murder and sentenced to 15 to 30 years in prison. In 1995 he was diagnosed with a seizure disorder and prescribed Dilantin to control his grand mal seizures. In 2004, Parsons was regularly taking Dilantin, as well as three psychotropic medications for his mental health issues.

On August 25, 2004, Parsons was transferred from Gus Harrison Correctional Facility to Standish. He arrived at Standish between 9:00 a.m. and 10:00 a.m. At 6:40 p.m., Nurse Jessica Pausits conducted a medical intake, noting that Parsons had arrived at Standish without his medications. Pausits then scheduled him to see a medical service provider or "MSP" the next day.

The parties explain that three possible options existed for obtaining medication for a prisoner at Standish. First, the normal procedure was to order medications through a company called PharmaCorr in Oklahoma, a subsidiary of CMS, which is a corporation providing medical services to Michigan prisoners under a contract with the state. The medications from PharmaCorr would usually arrive the day after being ordered, but delivery could take as long as three or four days.

Second, medications could be ordered and picked up from a local pharmacy. Third, if the need for medication was immediate or urgent, certain medications could come from a doctor's box or "stock meds" available on-site at Standish. According to Pausits, the stock meds included Dilantin.

Pausits testified that she was unable to order Dilantin or any other medication from the local pharmacy when she conducted Parsons's intake because the cut-off time for ordering from the pharmacy was 4:00 p.m., over two hours earlier. She also testified, however, that she could have obtained Dilantin for Parsons if she believed it was an emergency situation, but that she did not believe Parsons's lack of Dilantin was an emergency.

Physician's assistant Sara Hope Heebsh examined Parsons at 8:49 a.m. on August 26, 2004, the morning after he arrived at Standish. Her report noted that Parsons suffered from a seizure disorder and that he was "extremely agitated, histrionic with flight of ideas, and a poor historian." It also explained that Parsons "state[d] he is taking his meds as directed." Heebsh prescribed 100 mg Dilantin to be taken twice per day and ordered laboratory tests to check Parsons's Dilantin levels in one week. She indicated that Parsons's Dilantin medication should have a "Start Date" of "08/26/2004," the same day of the examination, but she did not include instructions that the Dilantin should be ordered from the local pharmacy. It is unclear whether Heebsh was aware that Parsons arrived at Standish without his medication. Heebsh testified: "[T]he way I handle patients that . . . don't have their medications, when I write the order for their medication, I write 'start today,' which indicates to me and to the nurse that there is no medication and it needs to be started today." She did not write "start today" on Parsons's report.

A few hours later, Parsons was seen by a psychiatrist, Dr. John F. McCarthy. From Standish's medical computer records, Dr. McCarthy was aware that Parsons had been examined by Heebsh and that Heebsh had ordered Dilantin. Dr. McCarthy prepared a prescription order for the three psychotropic medications Parsons had been taking: Lithium Carbonate, Zyprexa, and Remeron. Recognizing that Parsons was "somewhat agitated" and that "he really should be on his medication," Dr. McCarthy ordered a five-day supply of Parsons's psychotropic medications from the local pharmacy. Under "Special Nursing Instructions," he wrote, "Medications for 08/26/04 to 08/31/04 should be obtained from the local pharmacy." The remaining thirty-day supply of medications were to be ordered from PharmaCorr.

Parsons's Dilantin was ordered from PharmaCorr and apparently arrived August 27, the day after it was prescribed by Heebsh and ordered by the nurse. According to pharmacy records, Standish obtained the five-day supply of Parsons's psychotropic medicine from the local pharmacy on August 26.

The parties dispute many of the facts surrounding the administration of Dilantin to Parsons. According to Standish records, Parsons received his first dose of Dilantin at 6:00 p.m. on August 27. Pausits testified that she dispensed Dilantin to Parsons on August 27, and she initialed Parsons's Medication Administration Record ("MAR"), which indicates that she gave Parsons his Dilantin. However, according to the prison unit log, Nurse Alexander, not Pausits, performed the medication round on August 27. Parsons's MAR indicates that he received a second dose of Dilantin at 8:00 a.m. on August 28 from a Nurse Sharp, who is not a party to the litigation.

At some point on August 27, Parsons sent a "kite" requesting some form of mental health services. Alexander processed the kite and forwarded it to outpatient mental health but took no further action. He testified that he did not recall the nature of Parsons's request for mental health services, and the kite itself has apparently disappeared.

After the evening meal on August 28, officers observed Parsons acting strangely and wearing his shower shoes on top of his regular shoes. Parsons was "laid in," meaning he was to return to his cell and stay there until he could be seen by an officer or mental health provider. A short time later, around 5:06 p.m., Sergeant Steven Bond went to Parsons's cell and found him unresponsive on the floor. He was pronounced dead at 5:56 p.m. on August 28.

Two autopsies were performed on Parsons. The first, performed by the Arenac County Medical Examiner, noted a "fresh tongue bite indicating episode of seizures at the time of death" and concluded that Parsons "died of seizures disorder." The second autopsy, performed by Spectrum Health at the request of Parsons's family, originally stated that the cause of death was undetermined but was later supplemented to state that Parsons died of a seizure. The forensic pathologist at Spectrum Health also ordered a toxicology screen on Parsons's blood. The toxicology results showed a complete lack of Dilantin in Parsons's system, suggesting that he did not ingest any Dilantin medication for at least three days prior to his death. The toxicology results also showed the presence of Wellbutrin, also known as Bupropion. Wellbutrin is an anti-depressant that is contraindicated for individuals suffering from seizure disorders and can contribute to causing a seizure. Dr. McCarthy testified that "[i]f somebody has uncontrolled seizures it would be a very poor idea to use Wellbutrin," but that it could possibly be used for a patient with well-managed

seizures in consultation with the patient's neurologist "as a last resort if other medications had failed." Other than the toxicology report, there is no evidence that Parsons received or was prescribed Wellbutrin, and it is unclear how it entered his system.

In 2007, Plaintiff Jeannie Parsons, as the personal representative of Randy Parsons's estate, filed this 42 U.S.C. § 1983 action against a number of defendants, alleging deliberate indifference to Parsons's serious medical needs in violation of the Constitution. Heebsh was dismissed from the original suit for lack of service, and Plaintiff subsequently brought suit against Heebsh and CMS in *Parsons v. Heebsh*. The district court eventually granted summary judgment to all defendants in both cases, and the appeals have been consolidated.

**II.**

We review the district court's granting of summary judgment de novo. *Profit Pet v. Arthur Dogswell, LLC*, 603 F.3d 308, 311 (6th Cir. 2010). The district court determined that each of the defendants was entitled to summary judgment based on qualified immunity and Parsons's failure to produce evidence of conduct rising to the level of a constitutional violation.

The Eighth Amendment, applicable to the states under the Fourteenth Amendment, prohibits prison officials from "acting with 'deliberate indifference' toward [an] inmate's serious medical needs." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). A constitutional claim for denial of medical care has both an objective and a subjective component. *Id.* "The objective component requires the existence of a 'sufficiently serious' medical need." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "[A] medical need is objectively serious if it is one that has been diagnosed by a physician as

- 6 -

mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* at 897 (internal quotation marks omitted and emphasis removed). "[T]he seriousness of a prisoner's medical needs may also be decided by the effect of delay in treatment." *Id.* (internal quotation marks omitted and emphasis removed). The defendants do not contest that Parsons had a sufficiently serious medical need–he suffered from a seizure disorder, he did not have his anti-seizure medication for at least two days and possibly for the entire time he was at Standish, and he ultimately died from a seizure.

This case turns on the subjective component of the deliberate indifference standard. "To satisfy the subjective component, an inmate must show that prison officials had 'a sufficiently culpable state of mind.'" *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (quoting *Farmer*, 511 U.S. at 834). "Deliberate indifference entails something more than mere negligence, but can be satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Blackmore*, 390 F.3d at 895-96 (internal quotation marks and citations omitted). "[A]cting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Farmer*, 511 U.S. at 836.

Put simply, the deliberate indifference standard's subjective component requires a plaintiff to demonstrate that "the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at

837). It is not enough that an official "fail[s] to alleviate a significant risk that he should have perceived but did not." *Farmer*, 511 U.S. at 838.

The proposition that deliberate indifference to a prisoner's medical needs can amount to a constitutional violation has been well-settled since *Estelle* in 1976. Moreover, numerous decisions have involved the withholding or delayed administration of medication. *See, e.g., Canady v. Wilkinson*, 90 F. App'x 863 (6th Cir. 2004) (holding that delay in prescription was not Eighth Amendment violation because delay was inadvertent and quickly rectified); *Dozier v. Pauley*, 24 F. App'x 398 (6th Cir. 2000) (holding that prescription delay was not violation because plaintiff could not establish detrimental effect of delay in treatment). A number of cases involve the failure to provide Dilantin to a prisoner with a seizure disorder. *See, e.g., Hudson v. McHugh*, 148 F.3d 859 (7th Cir. 1998) (denying summary judgment for officers and nurse who allegedly failed to provide Dilantin to a prisoner known to take the medication for his seizure disorder). The idea that failing to provide medication like Dilantin can amount to a constitutional violation was therefore "clearly established" in 2004 when these events took place. *See Leary v. Livingston Cnty.*, 528 F.3d 438, 441 (6th Cir. 2008).

The qualified immunity inquiry thus collapses into the analysis of whether Parsons has produced sufficient evidence to show that the defendants were deliberately indifferent to Parsons's medical needs under the subjective component of the standard. In other words, because Parsons's constitutional right was clearly established in 2004, the defendants are only entitled to summary judgment based on qualified immunity if Parsons has not demonstrated evidence of a constitutional violation.

## III.

### A.  Pausits

A reasonable jury could conclude that Pausits was aware of the substantial risk to Parsons and failed to provide him with Dilantin at any point during his time at Standish.  Because this conduct would rise to the level of deliberate indifference, we reverse the grant of summary judgment to Pausits.

Pausits recognized that Parsons did not have his anti-seizure medication, but she testified that she did not view it as an emergency situation:

> **Q:**  Now, is - - is that an emergency to you?  If that guy showed up and didn't have . . . some of these Dilantin pills with him?
> **Pausits:**  No, it wouldn't be an emergency to me.  I wouldn't jump into my car and run to the pharmacy and get him some, no.
> **Q:**  You wouldn't call an ambulance and have them come up to pick him up?
> **Pausits:**  No, no.  No, I would not.
> **Q:**  People can go without the stuff and they can live to see the next day?
> **Pausits:**  Yes, they can.

The district court relied on this testimony and concluded that "[e]ven if [Pausits] *should* have known it was an emergency situation, unless she *actually knew* it was such a situation (which she did not), she committed no constitutional violation."

The deliberate indifference standard, however, does not require a plaintiff to show that a defendant knew of an "emergency situation."  Instead, Parsons must demonstrate that Pausits subjectively perceived facts from which to infer *substantial risk* to Parsons and that she did in fact draw the inference.  *See Comstock*, 273 F.3d at 703.  Common sense dictates that certain situations can present a substantial risk to a prisoner without being an emergency.  In *Farmer*, which explained

- 9 -

the subjective component of deliberate indifference, the Court held that prison officials could be liable for placing a transsexual prisoner in the general population when there existed a substantial risk of harm to that prisoner. *Farmer*, 511 U.S. at 847-49. The prisoner claimed to have been beaten and raped two weeks after being placed with the other inmates. *Id.* at 830. The initial placement of the prisoner with the general population did not create an emergency situation, but it did "expose [the] prisoner to a sufficiently substantial 'risk of serious damage to his *future* health.'" *Id.* at 843 (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)) (emphasis added). Parsons is required to show actual knowledge of this substantial risk of harm, not actual knowledge of an emergency situation.

Subjective knowledge of a substantial risk can be "demonstrat[ed] in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. This prevents a defendant from avoiding liability by simply denying knowledge after the fact. *See id.* In this case, Parsons points to the testimony of Dr. McCarthy as circumstantial evidence of Pausits's knowledge of the substantial risk. Dr. McCarthy stated that, when a patient arrives at the facility without his medications, "this creates a rather urgent–in our view, a somewhat urgent situation." Although this statement was in reference to all of Parsons's medications and not just his Dilantin, it is still circumstantial evidence that a medical professional at Standish like Pausits would have recognized the substantial risk.[1]

---

[1]In *Parsons v. Heebsh*, No. 11-1992, Plaintiff submitted the deposition of Dr. Gerald Sheiner. Dr. Sheiner testified:
> [W]hen a patient is taking [anti-seizure] medication regularly and stopped abruptly, the possibility or likelihood of a rebound event, in this case the emergence of a

Also, the risk to Parsons in this case should have been obvious. *See Farmer*, 511 U.S. at 842. "If the risk is obvious, so that a reasonable man would realize it, we might well infer that the defendant did in fact realize it . . . ." *Id.* (internal quotation marks and alterations omitted). Parsons suffered from a seizure disorder, was regularly taking Dilantin to control his seizures, and did not have his Dilantin upon arriving at Standish. Pausits was aware of each of these facts when she conducted intake. Even if it is not obvious whether these facts present an emergency situation, "a reasonable man would realize" that there exists a substantial risk to a seizure disorder sufferer who does not have his anti-seizure medication. *See id.* Although "it remains open to the officials to prove that they were unaware even of an obvious risk to inmate health or safety," this determination would fall to the trier of fact. *Id.* at 844.

Parsons has presented sufficient evidence that Pausits was aware of a substantial risk to Parsons. Under the relevant standard, however, Parsons must also show that Pausits was deliberately indifferent by "disregard[ing] that risk." *Comstock*, 273 F.3d at 703.

A jury could conclude that Pausits was aware of the obvious risk to a seizure disorder sufferer who has not taken Dilantin for a number of hours. There is evidence that Pausits could have obtained Dilantin for Parsons immediately, as her own testimony demonstrates that Dilantin was

---

seizure disorder which the drug is designed to suppress, that possibility increases hour by hour. When does it become clinically significant? A concern, 6 hours after missing a dose; a serious concern 12 hours after missing a dose, a dire condition 24 hours after missing a dose.

This would be further circumstantial evidence that the risk to Parsons would have been obvious to a medical professional. However, the transcript of this deposition was only submitted in *Parsons v. Heebsh* and was not in front of the district court in *Parsons v. Caruso*, so it can only be considered with regard to defendants Heebsh and CMS.

available in the "stock meds," and she stated that she could have obtained the medication if she viewed the situation as an emergency. Pausits's actions demonstrate a conscious choice to let Parsons linger yet longer without his anti-seizure medication. Moreover, Parsons has submitted evidence of the general prison practice of ordering medications from PharmaCorr, a process which could sometimes take several days.

Pausits disputes that her decision to delay Parsons's receipt of Dilantin was the proximate cause of Parsons's injury. She notes that Heebsh saw Parsons the next morning, and there is no evidence that the interim delay caused Parsons's death. Even if Pausits's alleged indifference was not the "sole cause" of Parsons's death, it would still be "'a proximate cause if it [was] a substantial factor in the sequence of responsible causation.'" *See Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 620 (6th Cir. 2004) (quoting *Cox v. Admin. U.S. Steel & Carnegie*, 17 F.3d 1386, 1399 (11th Cir. 1994)). Given the risk involved in delaying providing anti-seizure medication to a seizure sufferer for over 24 hours, Pausits's decision could reasonably be considered a substantial factor in Parsons's death. Finally, Parsons can recover against Pausits so long as Pausits's inaction increased the *risk* of injury—no matter whether Pausits actually contributed to Parsons's death. *See Blackmore*, 390 F.3d at 899.

Moreover, in Pausits's case, evidence of deliberate indifference extends to August 27. There is conflicting evidence regarding Parsons's medication while he was at Standish. According to Pausits and Parsons's MAR, Pausits administered 100 mg of Dilantin to Parsons at 6:00 p.m. on August 27. The toxicology report after Parsons's death, however, did not discover any Dilantin in his system, suggesting that he did not receive this medication for at least three days prior to his death

on August 28. The toxicology results also showed the presence of Wellbutrin, which can exacerbate a seizure disorder. Also, there is a discrepancy in who was the nurse to dispense medications to Parsons on August 27–although Pausits signed Parsons's MAR, the prison unit log states that Alexander performed the medication round on August 27.

Viewing this evidence in the light most favorable to Plaintiff, a jury could reasonably determine that: (1) Pausits was aware of the substantial risk to Parsons and (2) Pausits did not administer Dilantin.[2] These determinations are reasonable because a jury could place more importance on the toxicology report rather than Pausits's testimony and the MAR. Furthermore, as indicated by the MAR, nurses are supposed to circle their initials if there were any problems administering the medication; Pausits's initials for 6:00 p.m. on August 27 were not circled, and a jury could conclude that this demonstrates that Parsons ingested whatever medication was given to him. Although the district court notes that there is no evidence "that Nurse Pausits willfully committed a medications error," *Farmer* makes clear that "deliberate indifference is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. Viewing the facts and drawing all reasonable inferences in favor of Parsons, Pausits's failure to administer Dilantin, even if she lacked intent or knowledge

---

[2] Based on the toxicology report, a third conclusion could be that Pausits in fact administered Wellbutrin to Parsons on August 27. This conclusion, however, may be too speculative–while a reasonable jury could conclude that Parsons could only have received Wellbutrin from a prison official dispensing the medication, a jury would have to connect additional dots to conclude that the official was Pausits. The determination that Pausits recklessly disregarded the risk to Parsons by failing to administer Dilantin when she had the opportunity requires only that the jury credit the toxicology report and the MAR, which shows that it was Pausits's duty to dispense medication, and is much less speculative than the conclusion that she actually administered Wellbutrin.

that harm would actually result, would exceed negligence and rise to the level of "recklessness" as required under the deliberate indifference standard. *See id.* at 836-37. Pausits's conduct, if true, would be especially reckless because of her familiarity with Parsons through the medical intake and her failure to initially provide Dilantin on August 25. Plaintiff has presented sufficient evidence to create a genuine issue as to whether Pausits acted with deliberate indifference in failing to administer Dilantin to Parsons.

### B. Heebsh

As with Pausits, Plaintiff has presented sufficient circumstantial evidence of the obviousness of the risk such that a reasonable jury could conclude that Heebsh was aware of the substantial risk to Parsons's health if it can be determined that Heebsh knew Parsons did not have his medication at the time she examined him. Moreover, Parsons submitted the testimony of Dr. Sheiner, who stated that a lack of Dilantin is "a dire condition 24 hours after missing a dose." If Heebsh did not know Parsons was without his medication, however, she would also be unaware of the substantial risk.

There is again conflicting evidence on this point. Heebsh testified that she was "sure [Parsons] had his medication on [August 27]," the day she met with him, because "[h]ad he not had his medication, [she] would have put 'start today'" on her report and prescription order. Heebsh also argues that the notation on her report that Parsons stated he was "taking meds as directed" indicates that she believed he had his medications.

There is sufficient conflicting evidence of this account such that one could reasonably conclude that Heebsh was aware that Parsons did not have his medication. First, Heebsh also noted

on her report that Parsons was "histrionic with flight of ideas, and a poor historian." This notation conflicts at least somewhat with Heebsh's argument that Parsons's statement that he was "taking meds as directed" would have been given weight by Heebsh during her meeting with him. Second, Pausits testified that Heebsh would conduct a "chart review" as "part of [her] job," and that this chart review would include Pausits's medical intake record, which indicated that Parsons did not have his anti-seizure medication. Pausits also testified about her general practice, which was to "write it on [Heebsh's] schedule and put the inmate's name and number, inmate so-and-so rode in, has no medications." Third, Dr. McCarthy, who met with Parsons shortly after Heebsh, testified that he was aware that Parsons "had been sent and his medications had not arrived with him" because he "was notified by the treatment team." This is sufficient evidence to create a factual dispute as to whether Heebsh was aware of a substantial risk to Parsons.

There is also sufficient evidence for a reasonable jury to conclude that Heebsh then disregarded that risk and acted with deliberate indifference in delaying providing Dilantin to Parsons. Viewing the evidence and drawing all reasonable inferences in favor of Plaintiff, Heebsh (1) knew Parsons did not have his Dilantin, either through her normal chart review or a note from Pausits; (2) did not immediately provide Dilantin, which was available in the "stock meds" or doctor's box; and (3) did not write "start today" on the order, ensuring that the Dilantin would come from PharmaCorr and at least one day would pass before Parsons received his Dilantin.[3] While "[d]eliberate

---

[3] Heebsh argues that she indicated a start date of August 26, which unequivocally gave instructions that Parsons should be given his medication that very same day. This argument conflicts with Heebsh's own testimony, however. She explained that, absent a "start today" note, the nurses "would have sent the order to PharmaCorr." Absent a "start today" note and assuming Heebsh was

indifference 'entails something more than mere negligence,'" *Blackmore*, 390 F.3d at 895-96

(quoting *Farmer*, 511 U.S. at 385), in this case there is evidence that a lack of Dilantin for a seizure

sufferer is "a dire condition 24 hours after missing a dose." By ordering Dilantin from the out-of-

state company instead of securing it locally or immediately on-site, Heebsh effectively ensured that

Parsons went without his anti-seizure medication for over two days, at the least, and possibly longer

if there was any delay in receiving the medication from PharmaCorr. This delay in administering

Dilantin, caused by Heebsh's conscious choice to order the medication off-site, is comparable to the

facts in many of the cases involving Dilantin. *See, e.g., Hudson*, 148 F.3d at 861 (denying summary

judgment for officers and nurse who allegedly failed to provide Dilantin to a prisoner, resulting in

his failing to receive the medication for fourteen days); *Johnson v. Hay*, 931 F.2d 456, 458 (8th Cir.

1991) (denying summary judgment for pharmacist who refused to fill Dilantin prescription based

on his view that the medication was "not appropriate"); *Neal v. Smith*, 1994 WL 395747, *4 (D. Md.

May 5, 1994) (denying summary judgment when plaintiff submitted evidence that officers failed to

provide his anti-seizure medication for ten days after being informed by prisoner of his health

issues); *Walker v. O'Leary*, 1986 WL 6428, *2 (N.D. Ill. May 28, 1986) (denial of anti-seizure

medication for seven days); *Mitchell v. Chester Cnty. Farms Prison*, 426 F. Supp. 271, 272-73 (E.D.

---

aware Parsons did not have his medication, Heebsh would have written the August 26 start date
knowing that it would be at least August 27 before the Dilantin arrived from PharmaCorr and was
administered to Parsons.

Penn. Dec. 30, 1976) (denial of anti-seizure medication for four days after repeated requests). The facts in this case plausibly demonstrate deliberate indifference on the part of Heebsh.[4]

### C. Dr. McCarthy

Dr. McCarthy met with Parsons August 26 shortly after Parsons's meeting with Heebsh. Parsons argues that Dr. McCarthy was deliberately indifferent by failing to immediately secure Dilantin for Parsons. There is insufficient evidence to support this claim.

Unlike Heebsh, Dr. McCarthy concedes that he was aware that Parsons arrived at Standish without his medication and that this created a "rather urgent" or "somewhat urgent situation." Dr. McCarthy contends that he was aware that Parsons had already met with Heebsh that morning and that Heebsh had prescribed Dilantin because the "order was already present in the [prison computer system] when [he] saw Mr. Parsons." He also testified that, under his work program, he is "forbidden to treat medical problems" and could not have written a prescription for or obtained Dilantin for Parsons. On the other hand, Plaintiff's expert, Dr. Walsh, stated in an affidavit that a psychiatrist in Dr. McCarthy's position is not forbidden to secure Dilantin for a patient in Parsons's condition.

---

[4] Like Pausits, Heebsh also argues that her failure to immediately provide Dilantin cannot be considered the proximate cause of Parsons's death. As explained above, Parsons need only demonstrate that Heebsh's indifference was a "substantial factor in the sequence of responsible causation." *See Trollinger*, 370 F.3d at 620 (internal quotation marks omitted). Moreover, contrary to Heebsh's assertions, there is sufficient evidence to conclude that Parsons's Dilantin would have arrived sooner had Heebsh instructed the nurses to order Dilantin from the local pharmacy–the psychotropic medications, ordered locally by Dr. McCarthy, arrived the same day. Given the risk associated with the delay in receiving anti-seizure medication, Heebsh's failure to provide Dilantin could be considered a proximate cause in this case.

Even assuming that Dr. McCarthy could have obtained Dilantin for Parsons, he did not act with deliberate indifference to Parsons's medical needs. As a mental health professional, it was reasonable for Dr. McCarthy to treat Parsons's mental health issues and defer to the medical provider (Heebsh), who had already ordered Dilantin for Parsons, for his medical issues. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. Even if Dr. McCarthy should have, in hindsight, expended more effort to ensure that Parsons received his Dilantin right away, his failure to do so does not amount to recklessness or deliberate indifference. "Medical malpractice" or negligence "does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106; *see Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976) ("Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess the medical judgments and to constitutionalize claims which sound in state tort law."). Dr. McCarthy is entitled to summary judgment because he did not act with deliberate indifference to Parsons's medical needs.

### D. Alexander

Plaintiff argues that Alexander acted with deliberate indifference by (1) improperly processing Parsons's kite on August 28 and (2) failing to administer Dilantin and instead administering Wellbutrin on August 27, if in fact it was Alexander and not Pausits who dispensed the medication on that date.

Parsons has not presented sufficient evidence demonstrating that Alexander acted with deliberate indifference in either situation. Although the kite was unfortunately not discovered in the course of this litigation, Alexander marked at 4:04 p.m. on Friday, August 27, that it involved some sort of "mental health req[uest]." Parsons claims that Alexander was deliberately indifferent to Parsons's serious medical needs when he placed the kite in a receptacle to be "forwarded to outpatient mental health," knowing that no doctor would respond before Monday, August 30. Alexander testified that he did not believe the request was urgent.

The problem with Parsons's argument is that there is no evidence that his kite had anything to do with his seizure disorder. Parsons had many mental health issues, for which he had been prescribed three psychotropic drugs, and this kite may have been related to those mental health issues. Therefore, even if Alexander was aware of Parsons's seizure disorder and the risk to his health from the lack of medication, a jury could not reasonably find that Alexander's processing of the kite rose to the level of deliberate indifference to that risk because the kite did not deal with Parsons's seizure disorder.[5]

With regard to the administering of Parsons's medication, as explained above, the facts are unclear. Pausits testified that she dispensed Dilantin to Parsons on August 27, and she initialed

---

[5] Parsons points to an August 28 letter from Parsons to his family as evidence that his kite request was urgent and should have been handled differently. In the letter, Parsons stated that he did not think he was going to "make it." But the suggestion that Parsons's statement meant that he was somehow aware of an impending seizure, and that this letter demonstrates the likelihood that Parsons's kite was related to seizures and not his mental health issues, is too tenuous. In fact, the letter demonstrates Parsons's anxiety and is consistent with the idea that his kite dealt with mental health issues. Regardless, there is insufficient evidence that the kite had anything to do with Parsons's seizure disorder or that Alexander acted with deliberate indifference in processing it.

Parsons's MAR, which indicates that she gave Parsons his Dilantin. However, according to the prison unit log, Alexander, not Pausits, performed the medication round on August 27. For his part, Alexander testified in his deposition that he had never met Parsons prior to his being discovered unconscious the evening of August 28.

Crediting the prison unit log and the toxicology report, a reasonable jury could conclude that: (1) Alexander, not Pausits, administered medication to Parsons August 27; and (2) Alexander did not administer Dilantin. This is insufficient evidence that Alexander "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *See Comstock*, 273 F.3d at 703. Unlike Pausits, Alexander did not have familiarity with Parsons through the medical intake and did not have the same opportunity to provide Dilantin to Parsons prior to August 27. There is no evidence that Alexander reviewed Parsons's medical chart or had any other reason to know that Parsons had gone over two days without his anti-seizure medication. Even if he performed the medication rounds on August 27 and failed to provide Dilantin to Parsons, this conduct in a single, isolated incident would not rise to the level of deliberate indifference.

### E. Director Caruso

Caruso was the Director of the Michigan Department of Corrections in 2004 when Parsons was transferred to Standish. Parsons's argument with regard to Caruso is difficult to understand. He seems to contend that Caruso should be held liable under 42 U.S.C. § 1983 for two reasons: (1) because she implemented or was responsible for policies and procedures that were deliberately indifferent, or resulted in officials acting with deliberate indifference, to Parsons's serious medical

needs in violation of the Eighth Amendment; and (2) because she failed to supervise subordinates who violated Parsons's constitutional rights. To be sure, Parsons has presented evidence of numerous possible systematic failures during Parsons's short stay at Standish that may have contributed to his death, including: the delay in conducting Parsons's medical intake; the failure of Pausits to immediately secure Dilantin for Parsons; Heebsh's ordering of the medication from PharmaCorr or, if she was unaware that Parsons lacked his medication, the breakdown in communication between the nurses and Heebsh; the possible failure to administer Dilantin to Parsons once it arrived at Standish; and the possible administering of Wellbutrin, a drug contraindicated for seizure disorder patients like Parsons.

However, this argument fails for at least two reasons. First, Parsons has not explained how the policy or procedure claim can be brought against Caruso. Under *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690 (1978), "[l]ocal governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy, statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Parsons has not cited any case where this sort of unconstitutional policy claim has proceeded against state officials like Caruso rather than against municipalities. Second, even if this policy claim was allowed to proceed against Caruso, Parsons has not presented sufficient facts to demonstrate that Caruso implemented any medical policies or procedures at issue in this case. As Caruso points out in her brief, she is not a medical professional and had virtually no involvement in medical-related policies.

Parsons also fails to present evidence that Caruso had any direct involvement in Parsons's medical care or treatment at Standish, or any direct involvement in the supervision of officials such as Pausits, Alexander, or Heebsh. In a supervisory liability claim, "the liability of supervisors [cannot] be based solely on the right to control employees." *McQueen v. Beecher Cmty. Schools*, 433 F.3d 460, 470 (6th Cir. 2006). In this case, although prison officials arguably engaged in unconstitutional conduct, as required for supervisory liability, Parsons cannot show that Caruso "either encouraged the specific incident of misconduct or in some other way directly participated in it." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (internal quotation marks omitted). Because Parsons has not produced any evidence that Caruso was involved in the direct supervision of the other defendants in this action and because the policy claim cannot be brought against Caruso, Caruso did not act with deliberate indifference and is entitled to summary judgment.

### F. CMS

The parties agree that Parsons can bring a *Monell* custom or policy claim against CMS. *See Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). "To prevail in a § 1983 action against [CMS, Plaintiff] must show that a policy or well-settled custom of the company was the 'moving force' behind the alleged deprivation of . . . rights." *See Braswell v. Corr. Corp. of Am.*, 419 F. App'x 622, 627 (6th Cir. 2011) (quoting *Miller v. Sanilac*, 606 F.3d 240, 254-55 (6th Cir. 2010)).

Although Parsons cannot point to any official CMS policy, he has arguably demonstrated that there existed a custom of ordering medications, if at all possible, from PharmaCorr in Oklahoma. A custom is a practice "that has not been formally approved by an appropriate decisionmaker," but

is "so widespread as to have the force of law." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997). Parsons presented the testimony of several defendants who suggested that the general practice was to order medications from PharmaCorr. However, even if this was the custom and the custom was attributable to CMS, Parsons cannot show that this custom was the "moving force" behind any deprivation of his Eighth Amendment rights. *See id.* While Parsons has produced evidence that obtaining medications from PharmaCorr could sometimes take several days, there is also plenty of evidence that the staff was free to disregard the general practice of ordering from PharmaCorr in order to secure medication sooner. Because of the evidence that the general custom of ordering from PharmaCorr could be easily overridden by the medical staff at Standish, it cannot be said that this policy resulted in deliberate indifference to Parsons's medical needs or was the moving force behind his alleged constitutional violations.

## IV.

With regard to Dr. McCarthy, Alexander, Caruso, and CMS, Parsons has failed to present sufficient evidence demonstrating deliberate indifference. As to Pausits and Heebsh, viewing the evidence in the light most favorable to Parsons, there is sufficient evidence of deliberate indifference to survive summary judgment.

**AFFIRMED IN PART, REVERSED IN PART,** and **REMANDED** for further proceedings.