**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 14a0259n.06

**No. 13-5315**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| ROBERT MITCHELL, | ) | **FILED** |
|  | ) | Apr 04, 2014 |
| Plaintiff-Appellant, | ) | DEBORAH S. HUNT, Clerk |
|  | ) |  |
| v. | ) | ON APPEAL FROM THE UNITED |
|  | ) | STATES DISTRICT COURT FOR THE |
| DAMON HININGER; CCA; CHERRY | ) | MIDDLE DISTRICT OF TENNESSEE |
| LINDAMOOD; DANIEL PRITCHARD; | ) |  |
| and ANGELA STEADMAN, | ) |  |
|  | ) |  |
| Defendants-Appellees. | ) |  |

Before: MOORE, GIBBONS and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. Robert Mitchell, an inmate at the South Central Correctional Facility in Clifton, Tennessee, slipped and fell on some concrete steps while returning from a work assignment in March 2009. After his fall, Mitchell complained of hip and back pain to the facility's medical staff. Over the next thirty-one months, he received a battery of tests, diagnoses, medications and treatments from medical professionals both within and without the facility, culminating in successful back surgery in October 2011. Mitchell claimed that the facility and its administrators acted with deliberate indifference to his serious spinal condition, violating the Eighth (and Fourteenth) Amendment's prohibition on cruel and unusual punishment. The district court disagreed, and so do we.

I.

Mitchell's post-fall medical records reveal a history of escalating tests, diagnoses, medications and treatments. Mitchell first visited the correctional facility's medical clinic in March 2009, when he noted that he "felt like [he] pulled something and had real sharp pain through [his] back and . . . hips." R. 154-1 at 72. The clinic gave Mitchell a prescription for pain medication and an analgesic balm. Mitchell did not visit the medical department again until five months later, when he reported to sick call with complaints of back pain. At first, the facility gave Mitchell a mild, over-the-counter painkiller, but later clinic visits in August, September and October led medical staff to take x-rays of Mitchell's back and hips and to prescribe more significant treatment. Through it all, Mitchell received a long list of painkillers, anti-inflammatories and muscle relaxants, including decadron, medrol, lodine, robaxin, nubain, percogesic, predinisone and gabapentin. Mitchell's clinic visits continued into November, when he explained that his prescribed medicines were not working. Clinic staff told Mitchell to continue taking his medications and ordered an MRI of his back.

After reviewing Mitchell's MRI results, the facility's medical staff scheduled a series of visits to off-site orthopedic specialists, who eventually recommended that Mitchell undergo back surgery to relieve his pain. Mitchell's road to surgery was not a straight one, and there were several missteps along the way. Mitchell, for example, consulted with four different back and joint specialists in January, February, August and September 2010, but the correctional facility often failed to provide copies of Mitchell's MRI images to the specialists. During these visits, however, the doctors were often able to review a report describing Mitchell's MRI. Similar problems arose

during several of Mitchell's specialist visits in 2011. A neurosurgeon consultation on May 10, 2011, for example, proved unproductive because the surgeon did not receive Mitchell's MRI results, and Mitchell claims the facility later faxed "someone else's" MRI to the surgeon, resulting in a faulty diagnosis of his back injury, *see* App. Br. at 18. At least one visit with an off-site specialist also had to be cancelled and rescheduled. The facility claims that it cancelled the appointment because Mitchell's father contacted the attending doctor before the visit, which was a breach of prisoner transport security procedures, while Mitchell argues that he missed the appointment because the facility failed to complete the requisite paperwork.

Mitchell's array of off-site visits came with an array of diagnoses and treatments. At Mitchell's first off-site appointment in January 2010, Dr. Hennessey recommended that Mitchell begin a physical therapy program to strengthen his lower back and noted that Mitchell might need to see a joint-replacement specialist to correct his hip problems. Mitchell eventually completed six physical therapy sessions between September and October 2010, but he saw no improvement in his back condition. Later appointments led to different recommendations. Drs. Limbird, Vittal and Neblett ordered that Mitchell undergo multiple tests, including additional MRIs and an electromyography exam, and Dr. Vittal recommended in August 2010 that Mitchell try different medications, including a possible steroid injection. Surgery became a serious option in November 2010, when Dr. Limbird suggested that surgery might "best . . . serve[]" Mitchell. *See* R. 102-2 at 8. In August 2011, Dr. Neimat ordered that Mitchell "undergo L1–L5 posterior laminectomies and

No. 13-5315, *Mitchell v. Hininger, et al.*

decompression." R. 102-4 at 101–02. With Dr. Neimat's order in hand, Mitchell received the back

surgery he wanted in October 2011.

Mitchell filed this § 1983 claim against Correction Corporation of America, the company

that runs the South Central Correctional Facility, as well as several facility officials, including its

warden and health services administrator. Mitchell alleged that the defendants violated his Eighth

Amendment right to adequate medical care, but the district court granted the defendants' motion for

summary judgment.

II.

To prove a violation of the Eighth Amendment, Mitchell must show that the facility and its

staff members acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*,

429 U.S. 97, 106 (1976). No one doubts that Mitchell's back and hip pain amounted to a serious

medical condition. The question is whether Mitchell has shown that the various defendants

demonstrated deliberate indifference to it. Even giving Mitchell's evidence all of the inferences to

which it is entitled on summary judgment, *see* Fed. R. Civ. P. 56, the claim nonetheless fails.

Deliberate indifference requires more than mere negligence, more even than medical

malpractice. *See Estelle*, 429 U.S. at 106. It requires something akin to criminal recklessness: The

defendant must "know[] that inmates face a substantial risk of serious harm and disregard[] that risk

by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

Where the claimant received treatment for his condition, as here, he must show that his treatment

was "so woefully inadequate as to amount to no treatment at all." *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (internal quotation marks omitted).

Judged by this standard, Mitchell cannot show deliberate indifference. After his slip and fall, Mitchell visited the facility's nursing staff, who prescribed him a painkiller and analgesic balm—treatments consistent with Mitchell's complaints of a pulled muscle. When his back pain returned in August 2009, Mitchell made nine trips to the clinic over the course of four months, and the medical staff prescribed him various painkillers, anti-inflammatories and muscle relaxants. And when Mitchell's back troubles proved too much for this drug regimen, the facility escalated Mitchell's treatments, ordering x-rays, MRIs and other tests to get to the root of Mitchell's problem, and eventually scheduled a series of off-site appointments with five different orthopedic specialists. These appointments led to additional treatment recommendations, and Mitchell underwent physical therapy and eventually back surgery to alleviate the pain. Whether Mitchell received good treatment or even negligent treatment at each stage is one thing. But it is a heavy lift to say that all of this amounted to deliberate indifference—"so woefully inadequate as to amount to no treatment at all." *Alspaugh*, 643 F.3d at 169.

Mitchell counters that his complaint is not with the medical care he received but with the administrators who prevented him from receiving more—and more aggressive—treatment, including steroid injections and earlier back surgery. But a desire for additional or different treatment does not suffice by itself to support an Eighth Amendment claim. *See, e.g.*, *Estelle*, 429 U.S. at 107;

No. 13-5315, *Mitchell v. Hininger, et al.*

*Rhinehart v. Scutt*, 509 F. App'x 510, 513–14 (6th Cir. 2013); *Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 384 (6th Cir. 2004).

Consider our decision in *Alspaugh*. A prisoner complained of a neck injury, but the prison's medical staff initially refused to treat him, and continued complaints of neck pain led only to minor remedies: an x-ray, a soft cervical collar and a prescription for Motrin. 643 F.3d at 165. This low-level treatment continued for ten months, when the prisoner had surgery after being transferred to a different prison. *See id.* The court found no deliberate indifference. "While at multiple points . . . [the prisoner] certainly would have desired more aggressive treatment, he was at no point denied treatment." *Id.* at 169. As in *Alspaugh*, so here: Mitchell targets the medical staff's failure to provide more or better treatment, not indifference to his condition, what amounts to a plea for us to "second guess medical judgments" as opposed to enforce the cruel-and-unusual-punishments ban in the Eighth Amendment. *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).

Mitchell adds that there was no medically justifiable reason for delays in his treatment. To be sure, "[w]hen prison officials are aware of a prisoner's obvious and serious need for medical treatment and delay medical treatment of that condition for non-medical reasons, their conduct in causing the delay creates [a] constitutional infirmity." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004). But no such problem arose here for several reasons.

First, although Mitchell has shown delay in receiving certain treatments, he has not shown any break in the treatment of his condition. The record, for example, shows a delay between the January 2010 recommendation that Mitchell receive physical therapy for his back and September

of that year when Mitchell completed his first therapy session, but Mitchell's back condition was not left untreated during the time. To the contrary: During the nine months, Mitchell attended three different appointments at Nashville General Hospital to see two different doctors, and he continued to take medications prescribed to alleviate his pain. Delayed physical therapy no doubt falls short of the ideal or even the semi-ideal, but that does not make it so "woefully inadequate" as to amount to deliberate indifference.

Second, the record provides medical reasons for many of the delays in treatment. Once Mitchell began seeing off-site specialists regarding his back problem, the diagnoses and recommended treatments came quickly—and often conflicted. Between January 2010 and October 2011, doctors diagnosed Mitchell with such ailments as hip dysplasia, lumbar spondylosis, and multilevel lumbar stenosis, which resulted in various treatment recommendations from physical therapy, to medication, to use of a cane, to back surgery. The ever-shifting diagnoses in Mitchell's treatment history provide legitimate "medical reasons" for many of the delays. Choosing one doctor-supported treatment regimen over another doctor-supported treatment regimen does not amount to deliberate indifference. *See Rhinehart*, 509 F. App'x at 513–14.

Third, Mitchell received the treatment he wanted—a successful back surgery—establishing that his claim turns on the pain he endured in waiting for the right diagnosis and the right remedy for it. He has not shown that his spinal condition worsened or complicated the surgery he ultimately received. As any sufferer of chronic pain knows full well, this allegation of injury is nothing to sneeze at. But this theory of injury still requires Mitchell to come to grips with the reality that the

prison never denied him pain medication when he needed it—a fact that undermines the notion that anyone was being reckless about his pain or, worse, trying to inflict pain on him. Mitchell's medical records chart an unbroken history of escalating pain treatment—escalating efforts in other words to *mitigate* the pain until a proper diagnosis and remedy (here surgery) emerged, even if it belatedly emerged. When prison doctors thought Mitchell's pain was minor, the facility's medical staff prescribed him minor pain remedies: over-the-counter ibuprofen and an analgesic balm. When Mitchell's pain proved too much for these low-level painkillers, staff gave him stronger medications: steroid pills, muscle relaxants and prescription-strength painkillers. The only time that Mitchell departed from this pain-management regimen came in mid-August 2010, when Mitchell himself refused to take the prescribed medications because he didn't like their side-effects. The record simply does not show deliberate indifference to the injury for which Mitchell seeks compensation. *See, e.g.*, *Estelle*, 429 U.S. at 107 (finding no deliberate indifference where "medical personnel [saw the plaintiff] on 17 occasions spanning a 3-month period" diagnosed him with "a lower back strain," treated him with "bed rest, muscle relaxants and pain relievers" even though other tests might have "led to an appropriate diagnosis and treatment for [his] pain and suffering"); *Olson v. Stotts*, 9 F.3d 1475, 1476–77 (10th Cir. 1993) (finding no deliberate indifference where the plaintiff alleged he suffered for "eighteen months while the prison failed to provide him with a heart specialist and surgery" because he had received "appropriate medical treatments" including pain medication during those months).

Mitchell separately complains that prison staff sent him to six of his eight appointments with off-site specialists without the images from his MRI exam, and that the facility sent "someone

else's" MRI to Dr. Neimat in May 2011, App. Br. at 18. His frustration is deserved; the facility's inability to keep his medical records straight was, to quote the district court, "careless and irresponsible." *Mitchell v. Hininger*, 2013 WL 456481, at \*3 (M.D. Tenn. Feb. 6, 2013). But a cognizable claim of negligence does not establish a cognizable claim of deliberate indifference. "When a [medical professional] provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001).

That is surely true of one or two failures to ensure that MRIs went to the off-site specialists in time for Mitchell's appointments. But what of the facility's *repeated* mishandling of Mitchell's MRI results? Mitchell points out that, while one or two acts of negligence do not violate the Eighth Amendment, a negligence recidivist may provide sufficient circumstantial evidence of unconstitutional deliberate indifference to get to a jury. *See Brooks v. Celeste*, 39 F.3d 125, 128–29 (6th Cir. 1994). That is true in the abstract. But it does not establish deliberate indifference here. The specialists still were able to render a variety of diagnoses regarding the cause of Mitchell's pain; they still were able to offer a wide range of treatment recommendations; they still were able to provide the treatment—surgery—everyone eventually agreed was needed; and through it all they consistently addressed Mitchell's pain-medication needs, the only source of claimed injury arising from the mis-directed medical reports.

No. 13-5315, *Mitchell v. Hininger, et al.*

III.

Thus far, we have considered Mitchell's claim from the perspective of all of the defendants and all of the medical care provided to him. Do things change if we look at his claim through the lens of the four individual defendants? We think not.

The question, in the words of our cases, is whether Mitchell has "allege[d] facts which, if true, would show that the official[s] being sued subjectively perceived facts from which to infer substantial risk to [Mitchell], that [they] did in fact draw the inference, and that [they] then disregarded that risk"? *Comstock*, 273 F.3d at 703. That is no small burden. "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838. Allegations of supervisory liability by themselves, moreover, will not do the trick. Instead of holding supervisors liable on a theory of vicarious liability, "the supervisors must have actively engaged in unconstitutional behavior" to be liable under § 1983. *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006). Mitchell cannot meet these requirements with respect to any of the four named defendants.

Start with Damon Hininger, the CEO of Corrections Corporation of America, and Daniel Pritchard, the assistant warden of the South Central Correctional Facility. Both claims are of a piece. Mitchell maintains that he served Hininger with the complaint, after which Hininger should have intervened on Mitchell's behalf, and that he told Pritchard about the delays in his treatment, after which Pritchard should have done the same. But these allegations do not suffice in this setting.

- 10 -

In light of the principle that lay officials may generally rely on medical staff's medical judgments, *see Spears v. Ruth*, 589 F.3d 249, 255 (6th Cir. 2009), Mitchell cannot even show that Heninger and Pritchard were aware of his mistreatment. At most they were aware that Mitchell wanted more treatment than the medical staff was providing. Failure to act in such a situation does not deliberate indifference make.

Mitchell's claim against Cherry Lindamood, the correctional facility's warden, is a variation on the same theme and suffers from a like problem. Mitchell claims that he and his father spoke to Lindamood about his back pain and treatment deficiencies without effect and that, on top of this problem, Lindamood approved the denial of a 2010 administrative grievance against Lindamood's subordinates, thereby condoning their behavior. The first theory suffers from the same supervisor-theory problems identified above. The second theory suffers from a distinct problem. The denial of a prisoner's grievance does not by itself support a § 1983 deliberate-indifference claim. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).

Last of all, Mitchell's claim against the facility's health services administrator, Angela Steadman, while the closest claim of the four, also fails as a matter of law. As medical administrator, Steadman's job duties included monitoring compliance with applicable policies and procedures, including ensuring that inmates had "access to appropriate levels of health care on a twenty-four-hour-a-day basis." R. 165-2 at 9-10 . However, Steadman did not have the authority to authorize an appointment with a doctor or other medical professional outside of the prison because she was not a nurse practitioner at the time. If a prisoner made such a request, Steadman

or a member of her staff would enter the request in a database, but it was the off-site medical director who had the authority to approve or disapprove the requests. If the request was approved, or an outside doctor requested another test or appointment, a third-party organization scheduled the outside appointment. There is no evidence that Steadman was responsible for overseeing this process.

Mitchell insists that Steadman demonstrated a culpable state of mind because she gave "false answers" in response to his 2010 administrative grievance. App. Br. at 38. Mitchell filed a grievance on August 30, 2010, complaining that he had gone to an appointment with Dr. Limbird without his MRI results and that he had yet to receive a doctor-ordered electromyography exam of his back. Steadman responded to this grievance on September 2, writing that Dr. Limbird had access to Mitchell's "MRI reports" and that Mitchell's chart indicated that his electromyography exam was "complete." R. 184-5. Steadman was right about the MRI "reports"—Dr. Limbird was able to review reports describing Mitchell's MRI images—but she was wrong about the electromyography exam. The notes on Mitchell's chart indicate that on August 13, Mitchell met with Dr. Vittal, who "planned [an electromyography exam] for 11/16/10," R. 102-1 at 64; the notes do not indicate that an exam had yet been completed. The record does not provide evidence of Steadman's state of mind or the reason that she stated that the electromyography exam was complete. However, given her lack of responsibility for overseeing Mitchell's medical care, this single error does not provide sufficient circumstantial evidence of deliberate indifference to overcome the motion for summary judgment.

Mitchell also relies on a Tennessee Department of Corrections report. A state investigator reviewed Mitchell's medical file in response to a complaint by Mitchell's father and found various problems—a doctor had recommended scheduling a joint injection for Mitchell but no injection had been performed, and a doctor had recommended physical therapy but no therapy sessions had been scheduled. Notwithstanding these deficiencies, the investigator did not conclude that Mitchell had received improper care. To the contrary, the investigator offered only modest recommendations for improvement: Perhaps the facility's medical staff could develop a better tracking system to "keep up" with all of Mitchell's treatments, consultations and appointments; and maybe the clinic should schedule additional consultations with medical providers to resolve disagreements over Mitchell's care. R. 184-33 at 3. At best, the investigation's findings support a claim that Steadman's record-keeping was negligent, not that it was deliberately indifferent.

## IV.

In addition to his claims against various individual administrators at the South Central Correctional Facility, Mitchell argues that the facility itself violated his Eighth Amendment rights by either adopting a policy or custom of providing inadequate treatment to its prisoners or negligently hiring or training its health administrator. Because Mitchell has not shown deliberate indifference on the part of any individual defendant, no constitutional injury exists to support this claim. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

V.

For these reasons, we affirm.