RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0163p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

KEVIN DARRAH,

  *Plaintiff-Appellant,*

  *v.*

DR. KRISHER; DR. ANDREW EDDY; KAREN STANFORTH;
DR. DAVID WEIL,

  *Defendants-Appellees.*

No. 15-4136

---

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:12-cv-00899—George C. Smith, District Judge.

Argued: December 7, 2016

Decided and Filed: July 26, 2017

Before: BOGGS, GILMAN, and DONALD, Circuit Judges.

---

## COUNSEL

**ARGUED:** Dorianne Mason, OHIO JUSTICE & POLICY CENTER, Cincinnati, Ohio, for Appellant. Debra Gorrell Wehrle, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellees. **ON BRIEF:** David Singleton, A. Dominick Romeo, Mark Clark, OHIO JUSTICE & POLICY CENTER, Cincinnati, Ohio, for Appellant. Debra Gorrell Wehrle, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellees.

---

## OPINION

---

BERNICE BOUIE DONALD, Circuit Judge. Kevin Darrah, an inmate at the Madison Correctional Institution ("MCI") in London, Ohio, filed suit against Defendants, Doctors

Krisher, Eddy, and Weil and Nurse Stanforth, under 42 U.S.C. § 1983, claiming that by denying and delaying necessary medical treatment, Defendants violated his right to be free from cruel and unusual punishment under the Eighth Amendment. The district court granted Defendants' motion for summary judgment. Darrah now challenges the district court's grant of summary judgment on appeal. For the reasons that follow, we **REVERSE** the district court's order and **REMAND** this case for further proceedings consistent with this opinion.

I.

Following his conviction and sentence in 2006, Darrah was committed to the custody of the Ohio Department of Rehabilitation and Correction ("ODRC"). Prior to this, Darrah had been diagnosed with Palmo-Plantar-Hyper-Keratoderma ("HPK"), a severe form of psoriasis that causes debilitating pain from large and deep fissures that form on the bottom of the feet. In December 2006, Darrah was transferred to the Lebanon Correctional Institute ("LCI"), where dermatologists at the medical center examined his HPK and noted that it had been treated successfully with Soriatane, and that multiple other treatments had proven ineffective. Following this diagnosis, the LCI medical center prescribed Soriatane, a drug that was outside of the ODRC's "Drug Formulary."

The ODRC maintains a Drug Formulary specifically developed for the ODRC and its institutions. The formulary "lists standardized medications that may be prescribed and dispensed for inmates by advanced-level providers without prior authorization from . . . the ODRC Office of Correctional Health Care." (R. 40-9, PageID # 269.) According to Defendant Eddy, medications that are not listed on the ODRC's Drug Formulary require a prior authorization. This is done through a request from an advanced-level provider. However, ODRC regulations require that "[m]edications on the ODRC's Drug Formulary should be used as a treatment option prior to prescribing non-formulary medications." (*Id.* at PageID # 270.) On the ODRC Drug Formulary, Methotrexate is the medication listed for treatment of psoriasis and rheumatoid arthritis.

The Ohio Department of Mental Health ("ODMH") regulates all ODRC medications. Defendants explain that "[t]he ODMH will only supply pharmaceuticals to Ohio correctional

institutions from the formulary list established by the ODRC's Pharmacy and Therapeutics Committee unless either the Bureau of Medical Services Medical Director or the Bureau of Mental Health Services Clinical Director approves a non-formulary medication." (Appellee Br., at 8–9; R. 51-3, PageID # 695.) According to Defendants, LCI did not become centrally regulated under ODMH until March 2012, and prior to 2012, LCI used its contract pharmacy to supply medications for its inmates. MCI, however, was centrally controlled by ODMH at the time of Darrah's transfer there on January 18, 2011, and could not procure non-formulary, non-approved medications.

While on Soriatane at LCI, Darrah reported good results, and his medical records indicated that his HPK was "much improved." Upon his arrival at MCI, the medical health staff performed a health screening on him and forwarded a list of the medications he had previously received at LCI to the MCI pharmacy. However, because Soriatane was not listed on the ODRC's Drug Formulary, the prescription was not filled.

Two weeks after he arrived at MCI, Darrah reported to Nursing Sick Call ("NSC") that he had not received Soriatane since his transfer to MCI. In response to this complaint, the medical staff contacted Dr. Weil to inquire about Darrah's Soriatane. Again, on February 17, 2011, Darrah contacted NSC, complaining that he still had not received his Soriatane.

On March 2, 2011, Dr. Weil examined Darrah. During this examination, Dr. Weil noted that although Darrah's heels were fissuring, he was in no apparent distress. Dr. Weil also noted that Darrah had used Soriatane with good results, and that Darrah believed that he had a prior authorization for Soriatane, which was still in effect. Following this visit, Dr. Weil ordered Darrah's previous medical charts and placed a new order for Soriatane. On March 22, 2011, Darrah sent a "kite" complaining that, even after his visit with Dr. Weil two weeks prior, he was still not given Soriatane. Darrah further complained that he had two "very large fissures" on each heel, that they caused him excruciating pain, and that he was in danger of contracting a staph infection. Darrah also filed a skin-complaint form, complaining that he was not receiving proper treatment for his feet. Nurse Stanforth, on March 22, 2011, arranged for Darrah to meet with Dr. Weil, who again placed an order for Soriatane.

On March 28, 2011, Dr. Weil again examined Darrah and noted that he had large "plaques/fissures" on his heels. During this visit, Darrah complained of pain and difficulty walking, and Dr. Weil placed him on "medical lay-in" for twenty days. Darrah also complained about having not received his Soriatane, and Dr. Weil once again attempted to order Soriatane for Darrah. On April 4, 2011, Dr. Weil examined Darrah. Dr. Weil noted that Darrah still had "plaque and fissures" on his heels. Nurse Stanforth also noted that Darrah had several calluses with some deep cracks/fissures on his heels. During this visit, Darrah again complained that he still had not received his Soriatane. At this point, Dr. Weil submitted a fourth request for Soriatane.

On April 6, 2011, Dr. Krisher denied Dr. Weil's request for Soriatane, stating instead that an alternative, Methotrexate, was available. Dr. Krisher also ordered that "'high potency steroids' and folic acid be used and that another medication, Dovenex, be prescribed as needed," and that Darrah's liver enzymes be monitored. (R. 53, PageID # 714.) The next day, Nurse Stanforth[1] informed Darrah and his wife, Lacona, that the request for Soriatane had been denied and that Methotrexate had been recommended instead. Both Darrah and his wife agreed to try Methotrexate and, on April 11, 2011, Darrah picked up the Methotrexate, along with folic acid, for self-administration, agreeing that he understood the dosage instructions.

Between April 13, 2011 and May 26, 2011, the record indicates that Darrah reported to the prison infirmary at least ten times; however, his progress notes do not refer to his HPK again until June 14, 2011. During this visit with Dr. Weil, Darrah reported that his feet were "no worse but no better," and Dr. Weil increased Darrah's Methotrexate dosage upon Darrah's request. On July 7, 2011, Darrah filed an informal complaint, stating that he was in constant and severe pain and prone to infection because he was not taking Soriatane. Nurse Stanforth, in response to this complaint, discussed with Dr. Weil and Darrah the conflicting information they had received because Darrah had told Dr. Weil that he wanted to "run on the track." On July 28, 2011, Darrah filed a grievance, stating that "the level of pain in [his feet was] the same whether [he was] sitting, standing, walking, or running," and that he runs to stay in good health; therefore, if he

---

[1]Nurse Stanforth served as the Health Care Administrator for MCI and first became aware of Darrah's condition in December 2006, when she served as LCI's Health Care Administrator.

would be in pain regardless, he "might as well try to stay healthy." (*Id.* at PageID # 715–16.) Darrah's grievance also stated that Methotrexate was not working for him, and that he was at risk of contracting an infection because another inmate had recently been diagnosed with a staph infection. Darrah was seen by a podiatrist on that same day, and the note reflected that while he had "multiple areas of severe HPK buildup," his HPK was "stable in nature." (*Id.* at PageID # 716.)

Between August and September 2011, Darrah was seen three times. On September 17, 2011, Darrah filed another skin-complaint form, complaining that he had not obtained any relief from his HPK. Darrah was advised to continue taking his medications as prescribed. On November 1, 2011, Dr. Weil examined Darrah and noted Darrah's complaint that Methotrexate was not working for him. Dr. Weil prescribed a pain medication "for the time being." Darrah had a follow-up visit on November 15, 2011, where he again complained that Methotrexate was not working for him.

Following Darrah's November examination, an attempt was made to get Soriatane through a private insurer, or from Canada. Darrah was informed that he could order the drug from a non-ODRC pharmacy, but that he (or his wife) would have to cover the costs. On November 21, 2011, a prescription for Soriatane was placed at a non-ODRC pharmacy. The record indicates that there were some custody disputes with the Soriatane and, on January 26, 2012, Dr. Weil filed a prior-authorization request to allow Darrah to receive the Soriatane. Darrah began taking Soriatane in February 2012, and his follow-up examinations in March and April indicated that his feet had improved and that his lesions were almost gone.

Darrah filed a complaint in federal court in September 2012, alleging that several employees of the ORDC and MCI violated his rights under federal and state law, and seeking monetary damages and injunctive relief. After an initial screening, the district court allowed Darrah's Eighth Amendment deliberate-indifference claim to proceed against Defendants Krisher, Weil, Eddy, and Stanforth.[2] Following discovery, Defendants filed a motion for summary judgment. Darrah responded in opposition. The magistrate judge recommended that

---

[2]The record indicates that after Darrah filed his complaint, the ODRC began to pay for his Soriatane.

the motion for summary judgment be granted as to Defendants Krisher, Weil, and Eddy, finding that Darrah failed to establish the subjective element of his Eighth Amendment claim. With respect to Nurse Stanforth, the magistrate judge recommended that the motion for summary judgment be denied without prejudice because she had waived her insufficient-service-of-process argument. The district court overruled the objections to the magistrate judge's recommendation and adopted it in whole. Nurse Stanforth subsequently filed a motion for summary judgment, which the district court granted.[3] Darrah filed this timely appeal.

## II.

We review a district court's grant of summary judgment de novo. *Brown v. Chapman*, 814 F.3d 447, 464 (6th Cir. 2016). Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Our role at the summary judgment stage is to determine whether, viewing the facts in the light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor, a genuine dispute of material fact exists—to wit, is there "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party"? *Brown*, 814 F.3d at 464 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

## III.

Eighth Amendment jurisprudence clearly establishes that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain'" that is violative of the Constitution. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). For this reason, "deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." *Id*. at 105. A prisoner bringing a claim of deliberate indifference must meet two requirements to succeed. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The first requirement—the objective factor—requires that the deprivation alleged be of a sufficiently serious need. *Id*. The district court concluded that Darrah's HPK amounted to an objectively serious condition, and Defendants do not dispute this

---

[3]The district court also dismissed the official-capacity claims against Defendants, holding that because Darrah sought monetary damages and retroactive declaratory relief, his claims were barred by the Eleventh Amendment. Darrah does not appeal this holding.

finding. We, therefore, focus our determination on whether genuine disputes of material fact remain as to the second requirement—the subjective element.

The subjective requirement "follows from the principle that 'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.'" *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). This means that the defendants must have a "sufficiently culpable state of mind." *Id.* (citations omitted). At the summary-judgment stage, "the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837).

Darrah points to three time periods during which Defendants acted with deliberate indifference to his HPK and the pain and suffering produced by it: (1) between January 2011 and April 2011 (the first three months of Darrah's incarceration at MCI)—when Darrah's HPK was essentially untreated; (2) between April 2011 and February 2012—when Darrah was initially prescribed and treated with Methotrexate instead of Soriatane; and (3) between August 2011 and February 2012—Darrah's continued treatment with Methotrexate despite the lack of improvement. For clarity, we address each Defendant's potential liability as it relates to each time period.

## A. *Defendant Dr. Weil*

Dr. David C. Weil was the Chief Medical Officer and an advanced-level provider at MCI. Through his position at MCI, Dr. Weil was responsible for the daily medical care of inmates at MCI, and he performed several medical examinations on Darrah in relation to Darrah's HPK. Darrah argues that from the time he was first transferred to MCI on January 18, 2011, until April 11, 2011, he received no medication to treat his HPK, despite Dr. Weil's knowledge of his diagnosed condition and his prior effective treatment with Soriatane. According to Darrah, this failure to provide any treatment during this period constituted a knowing interference with his "prescribed plan of treatment," which constitutes deliberate indifference.

In *Boretti v. Wiscomb*, we reiterated that the "interruption of a prescribed plan of treatment could constitute a constitutional violation." 930 F.2d 1150, 1154 (6th Cir. 1991) (citing *Estelle*, 429 U.S. at 105). In that case, we specifically found that the plaintiff had stated a claim of deliberate indifference where he alleged that, for five days, defendants refused to look at his wound or change the dressing even after several direct requests and after a sick-call slip was sent to the infirmary. *Id.* Our precedents make it clear that neglecting a prisoner's known medical needs may constitute deliberate indifference. *See, e.g., Comstock*, 273 F.3d at 702 ("[W]e have long held that prison officials who have been alerted to a prisoner's serious medical needs are under an obligation to offer medical care to such a prisoner." (citing *Danese v. Asman*, 875 F.2d 1239, 1244 (6th Cir. 1989))). Even relatively short periods of delay or neglect have sufficed. *See Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 844–45 (6th Cir. 2002) (finding that the defendant doctor acted with deliberate indifference where he waited approximately one hour after being paged to attend to the prisoner, despite knowing of the prisoner's numerous health conditions that placed him at risk for a heat stroke); *Byrd v. Wilson*, 701 F.2d 592, 594–95 (6th Cir. 1983) (concluding that the plaintiff, a pro se prisoner, produced sufficient evidence for this Court to reverse the district court's finding of frivolity on his deliberate-indifference claim where he was denied his prescribed medication and diet for two days).

The district court, in its adoption of the magistrate judge's report and recommendation, failed to adequately address this claim. Instead, it concluded that Darrah's claim was unavailing and Defendants' failure to provide Soriatane to Darrah upon his transfer to MCI was not dispositive because Methotrexate had been provided in its stead based on the ODMH regulations. Although the provision of Methotrexate and the ODMH regulations are important considerations, this conclusion misses the point of Darrah's argument here and fails to address the fact that, for almost three months, Darrah was not provided *any* medications for his HPK. Defendants, likewise, do not dispute that there was a three-month delay between Darrah's arrival at MCI and him receiving any HPK medication. Rather, Defendants argue that they were derailed by Darrah's misrepresentations that he had a prior authorization for Soriatane.

Viewing the facts in the light most favorable to Darrah, as we are required to do in a motion for summary judgment, we believe that Darrah has sufficiently shown that genuine disputes of material fact exist as to whether Dr. Weil was deliberately indifferent for failing to provide any HPK treatment during this three-month period. Darrah has provided evidence to show that his HPK and his need for medication were known to Dr. Weil at the time of his arrival to MCI, but not addressed; that he made several complaints about his lack of Soriatane, including reporting to NSC multiple times; and that he was not treated for the three-month period in question. True enough, Dr. Weil sought to prescribe Soriatane for Darrah, prescribed pain medication, and ordered a medical restriction that placed Darrah on "lay-in" for twenty days. Considering the seriousness of Darrah's condition, however, we cannot say that this lackadaisical pace over three months defeats Darrah's deliberate-indifference claim. Even further, Defendants' argument that Darrah's misrepresentations about his prior authorization for Soriatane contributed to the delay, to the extent relevant, does not entitle Defendants to summary judgment. At most, it raises a factual question that is not suitable for this Court or the district court to determine on summary judgment.

Darrah also argues that there was deliberate indifference to his medical needs when, in April 2011, Defendants insisted on prescribing Methotrexate despite knowing that Soriatane was the only drug that had proven effective for Darrah's HPK. True, Dr. Weil cannot be liable for this decision as Dr. Weil requested that Dr. Krisher approve a prior authorization request for Soriatane. Dr. Weil might be found liable, however, based on Darrah's claim that Defendants were deliberately indifferent for continuing to treat him with Methotrexate after Darrah had been on the drug for several months without any noticeable improvement.

After Darrah began receiving Methotrexate in April 2011, the record is replete with evidence that Dr. Weil examined him numerous times, and that Darrah continued to complain that Methotrexate was not alleviating his HPK or the pain therefrom. The record indicates that the only affirmative action that Dr. Weil took was to increase the dosage of Methotrexate, and advise Darrah to continue taking his medication. Defendants dispute this assertion, stating that the medical records refute Darrah's assertions of pain and "give credence to the lack of subjective awareness of [Defendants]." (Appellee Br., at 23.) Defendants further allege that "it

is reasonable to believe that [Darrah] may have intentionally not taken the Methotrexate so that it could subsequently be determined ineffective." (*Id.* at 25.) With no evidence in the record to support this allegation, Defendants' contention is at the very least baffling, and at the most, highly speculative.

We have held that "[w]hen the need for medical treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." *Terrance*, 286 F.3d at 843 (quoting *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989)). Darrah's complaint is that Methotrexate was so ineffective in treating his HPK that it was essentially the equivalent of no treatment at all. Although the record indicates that Dr. Weil monitored Darrah for infections during the period that he was on Methotrexate, the question of whether it was reasonable to continue to keep him on a drug that had proven ineffective and whether that course of treatment constituted deliberate indifference is a question best suited for a jury.

Darrah, as further evidence of deliberate indifference, asserts that, during the time his HPK was being ineffectively treated with Methotrexate, he faced a substantial risk of contracting a contagious disease, and Defendants disregarded this risk. The district court discounted this argument because Darrah did not in fact contract an infection during this period. We disagree with the district court's reliance on the fact that Darrah did not develop an infection. We have previously stated that "the test for deliberate indifference is whether there exists a '*substantial risk* of serious harm,' and does not require actual harm to be suffered." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 899 (6th Cir. 2004) (internal citations omitted).[4]

In essence, Dr. Weil's failure to provide any HPK medication during Darrah's first three months at MCI could support a finding of deliberate indifference to Darrah's serious medical needs because a jury could find that Dr. Weil disregarded the substantial risk of harm to Darrah

---

[4]The district court found that there was no evidence that Dr. Krisher actually knew that Darrah was sharing a cellblock with other inmates who suffered from infections. Defendants also argue that Darrah has pointed to no evidence that they were subjectively aware of the risk of infection. The district court's conclusion here, however, cannot apply as easily to Dr. Weil. Further, to the extent that Defendants argue that there is no evidence that they were aware of Darrah's exposure to infections, this argument is squarely disputed by Darrah and the evidence that he has provided in support of his claim. Defendants' assertions to the contrary merely create a genuine dispute of material fact that makes summary judgment improper here.

stemming from leaving his HPK untreated. Similarly, Darrah has sufficiently shown that Dr. Weil's actions during the ten-month period that his HPK was being ineffectively treated with Methotrexate could constitute deliberate indifference.

### B. *Defendant Nurse Stanforth*

Darrah's claim of deliberate indifference as it relates to Nurse Stanforth is arguably a closer question. As the district court noted, Nurse Stanforth is not an advanced-level provider who has the authority to prescribe medications for inmates. As MCI's Health Care Administrator, however, Nurse Stanforth was "responsible for decisions about the deployment of health resources and providing clinical and administrative supervision to institution medical staff 24 hours a day, 7 days per week." (R. 72, PageID # 868.) According to Darrah, Nurse Stanforth's potential liability stems from the "abdication of her duties to ensure that inmates receive appropriate medical care." (R. 68, PageID # 829.)[5] We have previously sustained deliberate-indifference claims holding a defendant liable for "'abandoning the specific duties of [their] position[s] . . . in the face of actual knowledge of a breakdown in the proper workings' of their respective departments or facilities," such that this failure resulted in a direct violation of the plaintiff's Eighth Amendment rights. *Estate of Young v. Martin*, 70 F. App'x 256, 260 n.3 (6th Cir. 2003) (quoting *Hill v. Marshall*, 962 F.2d 1209, 1213 (6th Cir. 1992)).

As with Dr. Weil, Darrah argues that Nurse Stanforth was deliberately indifferent to his medical needs between January 2011 and April 2011, when he first arrived at MCI, and between April 2011 and February 2012, when he was being ineffectively treated with Methotrexate. The record establishes that Darrah was not provided with any medication to treat his HPK during his first three months at MCI. The record is equally clear that Nurse Stanforth, like Dr. Weil, knew of Darrah's HPK and his need for medical care. In fact, the record indicates that Nurse Stanforth first became aware of Darrah's HPK in December 2006 when she served as the Health Care

---

[5]The district court found that Darrah raised this argument for the first time on summary judgment. We disagree. In his complaint, Darrah stated that Nurse Stanforth, as MCI's Health Care Administrator, was responsible for the daily administration of healthcare services rendered at MCI. Darrah further noted that Health Care Administrators were responsible for assessing, directing, coordinating, supervising, and evaluating all healthcare services delivered at the institutional level. It is clear that the basis of Darrah's claim against Nurse Stanforth centers upon her failure to perform the essential duties of her position, which was raised prior to the summary-judgment proceedings.

Administrator at LCI. However, Darrah was not seen in NSC until two weeks after his transfer to MCI, and did not see a doctor until March 2, 2011. Even Nurse Stanforth did not personally meet with Darrah at MCI until April 4, 2011. As we previously noted, this neglect of Darrah's known serious medical needs may constitute deliberate indifference. *See Comstock*, 273 F.3d at 702; *Boretti*, 930 F.3d at 1154. Given Nurse Stanforth's position at MCI and the requirements of her position as Health Care Administrator, it is entirely possible that a jury could conclude that her failure to ensure the continuity of Darrah's treatment and her failure to, at a minimum, ensure that Darrah was seen by an advanced-level medical provider upon his arrival to MCI, constitutes deliberate indifference.

Darrah further argues that Nurse Stanforth's failure to consistently relay his complaints of pain to his treating physicians while he was on Methotrexate constituted deliberate indifference. Darrah points to evidence of the multiple grievances he filed during this period, complaining that he was in constant and severe pain and that he was prone to infection. Nurse Stanforth's reaction to this complaint was to question the severity of Darrah's pain. The record also contains evidence of multiple communications between Darrah's wife, Lacona, and Nurse Stanforth detailing Darrah's lack of improvement while on Methotrexate and the fact that there had not been any response from Nurse Stanforth. Darrah has, therefore, presented sufficient evidence to create a genuine dispute of material fact as to whether Nurse Stanforth's actions (or inaction) regarding his complaints of pain while on Methotrexate constituted deliberate indifference to his serious medical needs.

### C.    *Defendant Dr. Krisher*

Darrah argues that Defendants were deliberately indifferent by insisting on prescribing Methotrexate while knowing that Soriatane was the only drug that had proven effective for his HPK. According to Darrah, Methotrexate should never have been prescribed for his HPK because it is a drug primarily used in the treatment of cancer, and even its FDA-approved warning label cautions that the drug should be used to treat psoriasis only in cases where all other medications have proven ineffective. Additionally, Darrah argues that Defendants' reason for choosing Methotrexate over Soriatane was solely because Soriatane was the more expensive drug, and that this use of a non-medical factor as the sole reason for that determination was

improper.  Dr. Krisher, as a member of the ODRC Collegiate Review Board (the Board that must preapprove the prescription of any drug that did not appear on the ODRC Drug Formulary), was directly responsible for denying Dr. Weil's request for a prior authorization to prescribe Soriatane to Darrah.  Although Dr. Krisher did not work directly at MCI or personally treat Darrah, his position on the Review Board made him responsible for ensuring that Darrah received effective treatment.

As a general rule, a patient's disagreement with his physicians over the proper course of treatment alleges, at most, a medical-malpractice claim, which is not cognizable under § 1983.  *See Estelle*, 429 U.S. at 107; *see also Mitchell v. Hininger*, 553 F. App'x 602, 605 (6th Cir. 2014) ("But a desire for additional or different treatment does not suffice by itself to support an Eighth Amendment claim.").  Additionally, "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).  However, a decision to provide an "easier and less efficacious treatment" may suffice to establish deliberate indifference.  *Warren v. Prison Health Servs., Inc.*, 576 F. App'x 545, 552 (6th Cir. 2014) (quoting *Estelle*, 429 U.S. at 104 n.10).

We have previously held that "[w]hen prison officials are aware of a prisoner's obvious and serious need for medical treatment and delay medical treatment of that condition for non-medical reasons, their conduct in causing the delay creates [a] constitutional infirmity." *Blackmore*, 390 F.3d at 899.  This holding is consistent with the holdings of our sister circuits.  *See Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987) ("[I]f necessary medical treatment is delayed for non-medical reasons, a case of deliberate indifference has been made out." (citations omitted)); *Ancata v. Prison Heath Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985) (same).

The record in this case does not provide any medical reason why Darrah was given Methotrexate instead of Soriatane.  The only apparent basis for this decision was that Methotrexate was listed on the drug formulary.  We recognize that prisons have legitimate reasons to be concerned with the cost of medical treatment for inmates, and that a drug formulary

can be an appropriate method of controlling such costs. We note, however, that had Darrah merely argued that he should have received Soriatane instead of Methotrexate, our decision here would be different. *See Mitchell*, 553 F. App'x at 605. But Darrah does not just imply that he disagreed with Dr. Krisher's decision to prescribe Methotrexate over Soriatane. Rather, he asserts that only Soriatane had successfully treated his HPK, and that "Defendants knew that several alternatives had failed." (Appellant Br., at 36.)[6] The decision by Dr. Krisher to prescribe Methotrexate, according to Darrah, was a "less efficacious" treatment option. In *McCarthy v. Place*, we held that the defendant doctor took a less efficacious treatment route and was deliberately indifferent to an inmate's medical needs when, although aware of the significant pain that plaintiff suffered due to his dental cavity, the defendant failed to relieve the pain for over seven months and chose to prescribe Ibuprofen rather than prescribe a temporary filling. 313 F. App'x 810, 816 (6th Cir. 2008). In so holding, we noted that a reasonable jury could find, based on the record, that the defendant disregarded a risk of serious harm when he failed to temporarily fill the plaintiff's cavity, despite knowing that the plaintiff was in significant pain and despite being familiar with more effective treatment options. *Id*.

This reasoning also applies here as against Dr. Krisher. At the time of Darrah's transfer to MCI, Defendants were aware of the severe nature of his HPK, that he had been taking Soriatane prior to his transfer, and that Soriatane had been the only effective treatment for his HPK out of a number of other medicines that he had tried. Given Dr. Krisher's knowledge of Darrah's previous success with Soriatane; his knowledge that Methotrexate is a drug of last resort for psoriasis; and the fact that Methotrexate is an immunosuppressant that required Darrah to be monitored for severe side effects during its use, a reasonable jury could find that Dr. Krisher disregarded a risk of serious harm to Darrah by prescribing Methotrexate despite his familiarity with the more effective treatment option, Soriatane.

---

[6]It is important to note that Darrah does not specifically claim that he had tried Methotrexate unsuccessfully in the past or that, if he had, Defendants knew about it. In fact, the record indicates that Darrah and his wife agreed to try Methotrexate after Nurse Stanforth informed them that the request for Soriatane had been denied. These facts arguably weaken Darrah's deliberate-indifference claim, but they do not defeat it; rather, they raise a material factual dispute deserving consideration at trial.

**D.**　　*Defendant Dr. Eddy*

Dr. Andrew Eddy was the Chief Medical Officer for ODRC and the Director of the Collegiate Review Board. Like Dr. Krisher, he did not work at MCI or personally treat Darrah. However, in his position, Dr. Eddy had immediate control over decisions made by the Review Board, over the approval of medical care rendered, and over approval of requests for non-formulary medications. Dr. Eddy's potential liability stems from his decision to continue to deny Darrah's request for Soriatane after knowing that Darrah had been on Methotrexate without improvement, and after viewing pictures of the fissures and calluses on Darrah's feet.

The evidence in the record shows that in July 2011, after Darrah had been on Methotrexate for slightly over three months, he continued to complain that he was in pain and was at risk of developing an infection. Shortly after Darrah filed his grievance, Dr. Eddy reviewed Darrah's medical information, saw pictures of his fissured feet, and nevertheless decided to "continue with the current treatment plan," which was Methotrexate at the time. Viewing these facts in the light most favorable to Darrah, a reasonable jury could find that Dr. Eddy was deliberately indifferent to Darrah's medical needs by forcing him to remain on a medication that was ineffective in treating his condition.

Ultimately, under the facts of this case, we conclude that the conduct of Drs. Weil, Krisher, and Eddy and Nurse Stanforth could support a finding of deliberate indifference by a reasonable jury.

IV.

Because we hold that the district court's grant of summary judgment in favor of Defendants was improper, we must also address the issue of qualified immunity.[7] The doctrine of qualified immunity shields officials from civil liability if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The qualified immunity analysis has two steps: "(1) whether,

---

[7]The district court declined to address the issue of qualified immunity based on its finding that Darrah failed to show deliberate indifference.

considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310–11 (6th Cir. 2005) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

The first inquiry of the qualified-immunity analysis asks "whether plaintiff has alleged facts which, when assumed to be true, show that the defendants' conduct violated a constitutional right." *Comstock*, 273 F.3d at 702. This inquiry "collapses into the analysis of whether [Darrah] has produced sufficient evidence to show that [Defendants] were deliberately indifferent to [Darrah's] medical needs under the subjective component" of the deliberate-indifference standard. *See Parsons v. Caruso*, 491 F. App'x 597, 602 (6th Cir. 2012). We have already concluded that a jury could so find. Thus, we turn to the question of whether the right was clearly established.

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Comstock*, 273 F.3d at 702 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Further, we are not required to "find a case in which 'the very action in question has previously been held unlawful,' but, 'in the light of pre-existing law, the unlawfulness must be apparent.'" *Id*. (alterations and citation omitted). Initially, "[t]he proposition that deliberate indifference to a prisoner's medical needs can amount to a constitutional violation has been well-settled since *Estelle* in 1976." *Parsons*, 491 F. App'x at 602. Furthermore, we have already noted that this Circuit's precedent is clear that neglecting a prisoner's medical need and interrupting a prescribed plan of treatment, even for a relatively short period, can constitute a constitutional violation. *See Terrance*, 286 F.3d at 844–45; *Comstock*, 273 F.3d at 702; *Boretti*, 930 F.3d at 1154. Thus, it was "clearly established" in 2011, at the time of Darrah's transfer to MCI, that neglecting to provide a prisoner with needed medication, choosing to prescribe an arguably less efficacious treatment method, and continuing on a treatment path that was clearly ineffective could constitute a constitutional violation.

V.

For the above-mentioned reasons, we hold that Darrah has produced sufficient evidence to establish that a genuine dispute of material fact exists as to whether Defendants Krisher, Eddy, Weil, and Stanforth were deliberately indifferent. Such evidence precludes a grant of summary judgment. Accordingly, we **REVERSE** the district court's grant of summary judgment in favor of Defendants and **REMAND** this case for further proceedings consistent with this opinion.